Appellant, Odebrecht, S.A. and L. Ms. Stetson for the appellant, Mr. Goldman for the appellees. Ms. Stetson, before you begin, let me just say, apologize on behalf of the court. Judge Sentel has been delayed and we feel that we've waited long enough. We've waited long enough so he'll either join us or in any event will listen to the transcription. All right. Thank you, Your Honor. Good morning and may it please the court. My name is Kate Stetson. I represent the appellant Petrobras. Petrobras is an instrumentality of the Republic of Brazil and that means that a U.S. court cannot exercise jurisdiction over Petrobras unless one of the FSIA's statutory exceptions applies. The exception at issue in this case is the A2 of statutory provision 1605, Title 28. And the clause primarily at issue in this case is the direct effects clause, which says that a court may exercise jurisdiction over a foreign sovereign if that sovereign's claim against the sovereign is based on an act committed outside the U.S. that has a direct effect in the U.S. And the question on this appeal is whether a loss taken by the plaintiff's indirect foreign subsidiary is a direct effect in the U.S. The district court said it was and we argue that it's not. When these plaintiffs decided to invest in Sete Brasil, they decided to create two Luxembourgian companies, one EIG Parent and one EIG Luxembourg, we call it in the complaint. Through EIG Luxembourg, they purchased shares in another vehicle, a Brazilian investment vehicle called FIP Sondas. FIP Sondas in turn held shares in Sete Brasil. Our point is that when these plaintiffs came to the district court alleging a loss, what they were complaining about was a loss of their value of their shares in EIG Luxembourg. EIG Luxembourg was the entity that suffered the loss and it suffered that loss in Luxembourg. This is something that even the district court acknowledged to a point. If you look at page 308 of the joint appendix, the district court acknowledges that these plaintiffs, the funds, invested in Sete Brasil. But is the tort complete only when you can prove that there is a loss in the value of the shares? Was the tort complete upon making the investment under the allegedly false pretenses? I think there are cases in this circuit that counsel the former. The tort of fraud is complete and the locus of fraud is located where the loss is suffered. But just to cut through that sort of binary question, because in this case we think it's rather academic. If you look at where the loss is suffered, it was Luxembourg. If you look at where the funds were relinquished to purchase FIP Sondas shares, which in turn invested in Sete, that too was in Luxembourg. The only way that you can locate this loss somewhere else is if you back out from EIG Luxembourg to the parent all the way back to the funds. And there are basic corporate principles at work that suggest that you may not do that in the FSIA context. The funds would tell you that because they suffered a loss, they suffered financial injury, that caused a direct effect in the U.S. That was their argument below. It's their argument on appeal that you can cut through those corporate formalities and simply decide that the loss they suffered was a sufficiently direct effect. There are several problems with that. Well, let me ask you about the, because the way I've looked at this case is the nondisclosure, the so-called misrepresentation, the nondisclosure of the kickback scheme, was nondisclosed to this fellow, Perez or whatever, who came, had several meetings. That to me is where the loss occurred in that that's where the misrepresentation was made and that's where the decision was made to part with money, whether it then went to Luxembourg and then to Brazil. Right. So a couple points on that, Judge Henderson. The first is, while there is a debate, arguably, among restatements, among courts, about whether you locate the loss at the time of the purchase or at the time of the quantifiable loss, there's no debate that the place where you don't locate it is where the misrepresentation was made. That goes back to the Judge Friendly decision in the SAC case that we cite. So for these purposes, the fact that misrepresentations were made is not the operative fact. The operative fact is, what did these plaintiffs do? They could have, but did not, create a separate U.S. corporation. They could have invested in FIP Sandus through that separate U.S. corporation for reasons of their own, and these are sophisticated entities. They elected to create a Luxembourgian parent, which in turn created a Luxembourgian sub, which in turn invested in FIP Sandus, which in turn invested in Sece. Creating that parent and sub had beneficial consequences for these plaintiffs. That's assuredly why they did it. But it also has consequences for this lawsuit, and it means that the remedy that they seek is not available in a U.S. court, because by creating that separate Luxembourgian subsidiary, the Luxembourgian subsidiary took those losses, and you can find that at Joint Appendix 60. The Luxembourgian sub is the one that wrote down the losses from the loss of value of the investment, not the funds that created the parent that in turn created the sub. Mea culpa, my apologies. I invite my colleagues to impose a fine on me for being late. I'm very sorry. Understood, Judge Sentelle. No problem. Do we know, I know there are sealed documents in this record, but do we know the amount of money invested by Americans? I think it's $220 million. That I don't think is under seal. What percentage that is of all investors, and then what percentage of the investments, as opposed to the debt financing, was used for these drilling ships? I don't think that that is in the record, Your Honor, whether sealed or unsealed, that percentage of investors that this particular investment constituted. I tried to figure out the fact there were, I think, what is it, there were 28 of these ships at $700 million each, and $220 million didn't seem like a lot. I didn't do the whole numbers, but I was just trying to see how important the American investors were with respect to the argument about targeting. Because this was an international, I understand that, investment, but how important was America? I see. With respect to targeting, I think I have a couple thoughts. The first is, on the investments themselves, it bears noting that all of the other entities that invest in FIP Saunders, to our knowledge, are carrying forward proceedings in this case, and they're doing it in Brazil. This is the investor that chose not to do that. With respect to targeting, I would, again, go back to the statement that Bell Helicopter made years ago, which is, it's not enough simply for an American plaintiff to say, I suffered financial injury. Nor, we would say, is it enough for an American plaintiff to say, I was recruited to contribute money, and then I suffered injury. When that American plaintiff says that, not to create a U.S. sub, but to create a foreign subsidiary through which it perfects that investment. Now, this is not just me saying that this is a foreign indirect subsidiary, by the way. If you look at Exhibit B, to the plaintiff's opposition to the motion to dismiss below, was filed on October 7th, 2016. Exhibit B is an assignment, and it's an assignment that purports to come from EIG Luxembourg to the funds. And on page two of that assignment, what EIG Luxembourg says is, EIG Luxembourg is an indirect, so our entire thesis of this case is that a loss to an indirect subsidiary cannot be a direct effect on the funds. With respect to the subsidiary arguments, I would say that the funds raised in this case, one of them has to do with this idea that the Luxembourgian companies were mainly holding companies. They didn't, they were created for the purpose of investing in FIP Sandus, they didn't have another purpose, and so forth. A couple points on that. First of all, we embrace that, because again, they could have created a holding company in the U.S. and they chose not to. Second, for purposes of the FSIA, the fact that there is corporate separateness between EIG and the funds that it managed, and EIG parent Luxembourg and EIG subsidiary Luxembourg, is important. It can't be overridden, and it certainly can't be overridden with reference to a couple 10b-5 cases, Grubb and Abbey, I think are the two that are cited in the briefs, that stand for the proposition that in a 10b-5 case, you can locate a sort of judicially created standing principle by looking at who the actual purchaser of the securities was. There is no such principle that controls in the FSIA cases. So the holding company argument, we think, is beside the point. So I think what the contentions that the plaintiffs argue boil down to three. The first is because they suffered some financial injury, they have suffered a direct effect. I've already spoken to that. The fact that they suffered an economic impact under Bell Helicopter, under the Antares case from the Second Circuit, that is not sufficient to show a direct effect. You look at where the tort occurred, and whether you look at the beginning or the end, the purchase or the loss, the tort occurred in Luxembourg. The second argument is the holding company argument I just mentioned, that because these were so-called pass-through companies, they should be deemed to have suffered the loss. That is not the way it works in the world of corporate separateness. It's not the way it works under the FSIA. Why isn't the direct effect, isn't this sufficient? I keep coming back to the money started in America. I mean, the money, whether it went to Luxembourg or to Brazil, the effect was felt in America because the money started in America. The money started in America in the Antares aircraft case as well. The money started in America in that case and was sent to Nigeria when Nigeria seized and held Antares aircraft's sole asset. But the fact that the money started in America, was sent through a U.S. bank to Nigeria, was not relevant to the direct effects test for the reason that we were talking about earlier in the argument. When you look at that direct effects test, you don't ask where the money came from or whether there was an American plaintiff that was injured. That backs into the test the wrong way. You ask where the locus of the tort occurred. We know that it's not enough for the misrepresentation to have been made in the U.S. And by the way, I am giving the most charitable reading possible of the plaintiff's passive voiced complaint in that respect. You look at the locus of the tort, and here, the locus of the tort is Luxembourg. The fact that there was U.S. money earlier involved in creating a parent, which in turn created a sub, which in turn invested in a Brazilian vehicle, is not enough to chase all the way back to find the direct effect in the U.S. How is the locus of the tort in Luxembourg when the decision to part with the money was in America? I mean, I can see how you're arguing the money went from Luxembourg was an indirect effect because it went from Luxembourg to Brazil, but how does Luxembourg have the direct effect of the tort, of the fraud? The decision to part with the money is a component of the test, but the decision to part with the money occasioned the decision to create a Luxembourgian subsidiary in order to part with the money. So again, I think it would be a misreading of this Court's past precedence, certainly of Bell Helicopter, of the Antares case, to suggest that simply because a U.S. investor decided all the way back up the chain to invest in a particular entity, you look at what the investor did next, and what that investor did next could have been to create a U.S. entity, as I said. It didn't. What these investors did was to create a Luxembourgian entity, which in turn created a Luxembourgian entity, and so on and so forth. That corporate choice has consequences, and we are not, again, saying that these plaintiffs are without a remedy. They can do what every other plaintiff in their position has done, which is to take their claims to Brazil. What they cannot do is interpolate all the way back from their Luxembourgian indirect subsidiary, the subsidiary that took the loss, and interpolate that all the way back to claim that the effects were directly felt in the U.S. If there are no further questions, I'll reserve. All right. Thank you. Mr. Goldman? Hey, police and court. My name is Daniel Goldman. I'm with Kramer 11. I represent the plaintiffs at police. This case is not Antares. It's not Bell Helicopter. It's not about a plane being in which the commercial activities exception should apply. This is it. Oh, come on. Pardon me, Your Honor? Overstatement is not going to get you very far, counsel. I mean, you may win on this point, but to come in and say if ever there was a case where it should apply, you're relying, at this point at least, principally on the direct effects clause. Was it clause one or clause three? I guess it is. You admit by language, and I think it's in your reply brief where you said you don't have to have the most direct effects. You can't say this is the quintessential case for the application of the commercial exception, can you? Well, look, I... At best, it's a close case. I don't believe it's a close case, and I think that there are two reasons why this is not a close case. Number one, there's no question, and Petrobras does not deny, that it targeted, specifically targeted U.S. investors for such an investment. That's the acts first clause, right? Not the direct effects clause? Well, that's in the Atlantica case in the Second Circuit. Well, you have three clauses in the exception. No, that... One is the acts, one is the direct effects, and then the... No, that relates, in the Atlantica case, the Second Circuit, the Second Circuit held... Forget there's an Atlantic case. Which clause of the statute are you relying on? The third, the third clause, which is the direct effect clause. Direct effect clause, okay. And so what distinguishes this case, it's not just that there's a financial harm, it's the financial harm plus the fact that Petrobras specifically targeted U.S. investors. Is that an effect? That's not the effect, but what that means... That's not an effect, is it? That's not the effect. So the direct effects are felt where? The direct effects are felt in the U.S. When EIG invested... EIG is a shareholder in a subsidiary, and then there's an indirect subsidiary in Luxembourg? That's correct, Your Honor. That's correct. So the direct effects are actually felt by the indirect subsidiary in another country, aren't they? Under the third clause, all one needs is a direct effect in the U.S. Direct effect. A direct effect. Direct, yeah. And these subsidiaries would never have been set up but for the fraud. They were set up. They were indeed set up. They were set up. But here's the thing, is that really what Petrobras is arguing is that there's a, that because these subsidiaries, there's an intervening element. And, again, the... Intervening would seem to interrupt the course of the effect so it would no longer be a direct way. That's the argument. That is not only the argument, but it's a pretty good argument, isn't it? Well, but the fact is, and, again, if I could just quote Atlantica, Second Circuit, that says the intervening actions of a third party may sometimes break the causal chain between a defendant's alleged tortious conduct and the effect felt in the U.S. if the third party takes some independent action that causes a close effect in the U.S. The Luxembourg entities... You understand that that's not binding on that case? I understand that, Your Honor. I understand. The Luxembourg entities did nothing here. When the scandal was publicly disclosed, the loss flowed through Luxembourg to the U.S. directly. They had no ability to keep the loss in Luxembourg. They didn't take any independent actions. It's really no different than a product liability case where the manufacturer is liable and you have retailers and distributors in between who did nothing with respect to the manufacturing defect. So, yes, I mean, it would be a wonderful day for... Well, it's very different than a direct effect, than a product liability case. We're dealing here not with liability but with jurisdiction. That jurisdiction depends upon a waiver of sovereign immunity. Unless the manufacturer in a product case is a sovereign, you don't have a parallel case, do you? I understand that, Your Honor, but there are product liability cases in which there are foreign sovereigns and they've held that there's an FSA exception and that it's jurisdiction, notwithstanding the fact they're a foreign sovereign, that the intermediate retailers and distributors don't affect whether or not there's a direct effect. But the point is the Luxembourg entities did nothing. It would be a great day if my client could go to its investors and say, Don't worry. The loss is in Luxembourg. That's not the reality. No, there's a loss here. The question is whether it's direct. It is direct because the Luxembourg entities did nothing relative to the loss. The loss flowed straight through to the funds. The Luxembourg entities were set up because of the fraud, but for the fraud there never would have been a loss. And if you accept the district court's reasoning, which we argue, the loss, the direct effect happened immediately upon the investment, immediately upon the fact when EIG and the funds invested $221 million and it left bank accounts in the U.S. and flowed through Luxembourg and up. That's when the loss occurred immediately. The loss was quantified at a later time when the public scandal was disclosed and subsequent events. But the actual injury happened at the time of the fraudulent inducement and the American funds wired out $221 million from America. And that's counsel from Petrobras says, Well, these are just securities fraud cases, but this is, in a sense, a securities fraud case. Yes, it's not a 10B5 case because there were direct representations from Petrobras to EIG. But in a fraudulent inducement case, the injury suffered at the time that the plaintiff gives up its money. Do the U.S. investors have to be targeted in order for the third exception to apply? I think so, yes, Your Honor. And I think that at least if the court accepts the holding in Atlantica, what distinguished Atlantica was that the defendant contemplated U.S. investment and did extensive marketing in the U.S. So it wasn't simply just that there was an injury in the U.S. because the plaintiffs happened to live. It was that extra factor which brought it under the direct effects test, and that's at least what the Second Circuit held. And I think that's what distinguishes this case. It's not, again, about a plane being impounded in Nigeria. It's not about press releases being issued in South Africa. There's extensive marketing of this to U.S. investors, and, in fact, two U.S. investors invested, EIG and Luce, which is a Delaware entity, and the court wanted to know what percentage of the investment. The American investors invested took up 10% of the equity in this investment. So EIG invested $221 million. Luce invested over $100 million. That was 10% of the equity, and the remaining investment was going to be debt investment, principally from the Brazilian National Development Bank. And, as I said, going back to Atlantica, this case is anything stronger than in Atlantica because in Atlantica there's extensive marketing in the U.S., but there was no contact directly with the plaintiff. Here we have Petrobras sending information memorandum directly to EIG in D.C. You've got meetings in D.C. You have e-mails in D.C. So I think, if any way, this is a stronger case than Atlantica. I mean, look, two weeks ago Petrobras announced that it's paying $3 billion to settle a securities class action in the Southern District of New York that's been litigating there for three years. This case should also be litigated in America. I want to make one other point on the direct effect, which is that I think that the cases in the 10B-5 context, which are standing cases, are also persuasive. In those cases, the courts have routinely held that an investor who makes an investment through a holding company is the actual purchaser and has 10B-5 standing and constitutional standing if the holding company was set up for the sole purpose of making the investment, which is what happened here. So I do think those are analogous cases. Is there anything in the record about the cost of setting up the Luxembourg subsidiaries to EIG here in America? There's nothing in the record, but I don't think it was a big cost. I think these are just their holding companies. Incidentally, they have such a, in the name, which is, you know, they were set up specifically to make this investment. And I will also say that the reason they were set up is because Petrobras set up a structure so for foreign entities to invest into it, and if they did it in an appropriate way, they wouldn't have to pay Brazilian investment taxes. The U.S. funds could have invested directly. They got no, but the Cayman funds could invest directly into that structure. Otherwise, so that's why the Luxembourg structure was set up, because the Cayman funds are considered tax havens, and so you can't get the Brazilian tax benefit if you're a Cayman fund. So Luxembourg was set up because the Cayman funds principally, the American funds got no benefit from investing through Luxembourg. It was just done to make it a consistent investment. But it was because Petrobras set up a structure to encourage foreign investment, is where the whole Luxembourg structure came from. I do want to also address one point, which was not addressed in the argument, but certainly addressed in the briefs. I mean, we argued in our briefs that the direct effect on Luce investment, which is the American, the other American that was also a sufficient basis for finding a direct effector. Can we consider that it's outside the facts of this case? This is a legitimate question. I'm not arguing with you. I understand that. Well, that's a good question, and we say that it was not waived, because the law of the circuit is that if an issue is raised in oral argument before the district court. Aside from that, is that part of this case? When you have, you're not saying that the harm in this case was caused directly in the United States. You're saying that some other facts arising out of the same nexus caused somebody else harm in the United States who's not in this lawsuit. Right. It doesn't have to be in the lawsuit, as long as there is a direct effect in the U.S., whether or not. That's what I'm asking you, whether that is the law, and if so, what's your source of law? The source for that, again, is the Atlantica case, where that very argument was made, and the court in Atlantica said, well, even if all the plaintiffs were foreign, as long as there is a direct effect in the U.S., then that satisfies the direct effects test. And in terms of the waiver point, I'll just say that it was actually Petrobras during oral argument that raised the issue of Luce, and this is at Joint Appendix 391. It says, you know, the counsel for Petrobras said, in fact, there are at least four other proceedings brought in Brazilian arbitration. At least one of those four plaintiffs is actually a U.S.-based entity, and they all allege essentially exactly what EIG alleges here, apparent misrepresentations. And then the district court picked up on your point, Judge Centel, and said, well, my understanding of the law is that as long as there's a direct effect in the U.S., it could be to Luce, that satisfies. Petrobras didn't really answer it. They went back and forth, and those sites are at JA447 through 448, 449, and then at 476. I chimed in and said, yes, that's the correct state of the law. As long as there's a direct effect in the U.S., that's sufficient for the purposes of the direct effects test. So unless there are any further questions. Thank you. Okay, thank you. How much time does Ms. Stetson have? Ms. Stetson has 46 seconds. All right, I should take a couple minutes. May I ask you, starting out, what your position would be on jurisdictional discovery with respect to this targeting issue? So jurisdictional discovery was sought by the plaintiffs below, and Judge Maida rejected it because they had made, in his words, only a bare-bones request. That's at Joint Appendix 357 to 358. We don't think there's any warrant here to second-guess that determination, particularly given the bare-bones request. Let me make a couple quick points, if I could. The first on Atlantica Holdings. Let me follow up with that and ask your position on the targeting necessity. My position on targeting? My position on targeting with respect to the direct effects test is that the test is not called the targeting test. It is called the direct effects test for a reason. Even if we take, as I said earlier, the most charitable view of this complaint, and even if we accept for these purposes, despite the clever wording of the complaint, that there were misrepresentations made to U.S. investors in the U.S., the direct effects were felt in Luxembourg, and that was a choice that this investor made to create the Luxembourgian entity. I also, on that, want to make very clear something. Mr. Goldman just mentioned that Petrobras had encouraged the investment structure that was set up. If you look at the sealed Joint Appendix 365, what you will find is that Petrobras encouraged investment through an FIP, FIP Sandus. Petrobras never encouraged these plaintiffs, these funds, to create a Luxembourgian entity. In fact, what Mr. Goldman just said is the reason they did that had to do with the Cayman entities. But that doesn't excuse their choice to set up that separate corporate entity. The difference, finally, between this case and Atlantica is that the plaintiffs in Atlantica, and I'm reading from the case, made their purchases through a Miami office of UBS. Which it sent to its broker-dealer in New York using funds from plaintiffs' UBS accounts in New York. All of the transactional particulars happened in New York. Here, what you have is an initial decision to invest in a Luxembourgian entity, which in turn created another Luxembourgian entity, which in turn invested in a Brazilian entity, which in turn invested in Seche. That chain of events, which Mr. Goldman conceded rendered the subsidiary indirect, cannot be found to cause a direct effect in the U.S. under the FSIA. If there are no further questions. All right. Thank you. Thank you.
judges: Henderson, Wilkins, Sentelle